AO 108 (Rev. 06/09) Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT
for the
Eastern District of North Carolina

| | |
|---|---|
| In the Matter of the Seizure of | ) |
| *(Briefly describe the property to be seized)* | ) |
| $150,439.96 in U. S. Currency | )    Case No. 5:17-mj-1928-JG |
| | ) |
| | ) |

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the _____Eastern_____ District of _____North Carolina_____ is subject to forfeiture to the United States of America under _____18_____ U.S.C. § _____981(a)(1)(A)_____ *(describe the property)*:

$150,439.96 in U. S. Currency

The application is based on these facts:

☑ Continued on the attached sheet.

_____
*Applicant's signature*

James D. Yowell, TFO, DEA
*Printed name and title*

On this day, **JAMES D. Yowell**
appeared before me via reliable electronic means,
was placed under oath,
and attested to the contents of this
Application for a Seizure Warrant.

Date: **16 OCT. 2017**

_____
*Judge's signature*

City and state: Raleigh, North Carolina

James E. Gates, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, James D. Yowell, Task Force Officer, Drug Enforcement Administration, US Department of Justice, assigned to the Wilmington, North Carolina, Resident Office, declare and state as follows:

I am a duly appointed Task Force Officer (TFO) of the Drug Enforcement Administration (DEA), having been so assigned since March of 2015. I am employed as a law enforcement officer with the city of Fayetteville, North Carolina, and have been so employed since January of 2001. I have received specialized training in drug enforcement techniques while attending Basic Law Enforcement Training (BLET) at the Fayetteville Police Academy located in Fayetteville, North Carolina. Following my graduation from BLET, I have periodically received training in the investigation of narcotics related crimes. I have also been trained in physical and electronic surveillance, and have attended Basic Narcotic Investigator School at the North Carolina Justice Academy in Salemburg, North Carolina. During my career, I have participated in investigations involving violations of state and federal narcotics laws. Those investigations have resulted in convictions for the possession, sale, smuggling, and manufacturing of controlled substances. I have conducted surveillance, worked undercover, arrested suspects, executed search warrants, and seized evidence. I have assisted in the preparation of cases for trial and in court hearings where I have testified.

I have participated in numerous narcotics investigations, during the course of which I have: functioned in an undercover capacity, personally made controlled purchases and recoveries of controlled dangerous substances, conducted or participated in physical surveillance, written and executed numerous search and seizure warrants, reviewed taped conversations and the records of narcotics traffickers, and written affidavits for the court authorized Title III interception of eighteen (18) target telephone lines in the Eastern Judicial District of North Carolina. I have participated in at least six (6) investigations involving the monitoring and recording of both

state and federal court authorized Title III interceptions, including the interception of over one hundred (100) target telephone lines. I know from my training and experience that people involved in drug trafficking frequently use telephones to further their illegal activities. I also know people involved in drug trafficking frequently use coded language to discuss drug trafficking to discuss conversations about illegal activity.

Based on your Affiant's training, experience, and participation in narcotics investigations (including this investigation) involving trafficking of large amounts of illicit drugs and tracking proceeds gained by drug traffickers, your Affiant knows:

     a.    That drug traffickers often place assets in other persons' names and in the name of corporate entities to avoid detection and seizure of those assets by law enforcement officers;

     b.    That even though these assets are in other persons' names, the drug traffickers actually own and/or continue to use these assets and exercise dominion and control over them;

     c.    That drug traffickers often establish businesses to make it appear as if the drug traffickers have legitimate sources of income, and they often deposit drug proceeds to the bank accounts of these businesses to make it appear as though the drug proceeds were earned by legitimate business activities; and

     d.    That where an individual's income cannot account for the level of wealth displayed and where evidence of drug trafficking exists, there is probable cause that the item of wealth is either a direct product of illicit activity or is traceable thereto.

This declaration includes probable cause in support of an application for the issuance of seizure warrants for **a 2016 Chevrolet Corvette Sting Ray** seized from Clarence Dextor WORTHY at his home located at 1608 Boros Drive, Fayetteville, North Carolina and **$150,435.96** U.S. Currency (USC) seized from a Bank

of America Checking account (# 0006 8904 5046) in the name of
Clarence Worthy DBA WORTHY BROTHERS TOWING.

## SUMMARY OF THE INVESTIGATION

1.     Beginning in August of 2015, the Fayetteville Police
Department (FPD) began an investigation into the Drug
Trafficking Organization (DTO) of Jerry Jerome CLARK aka "TINE."
The investigation included statements of cooperating witnesses,
controlled purchases of illegal drugs, physical surveillance,
and the court-authorized interception of wire communications
over telephones used by members of the DTO. During the
investigation, intelligence was developed indicating Clarence
Dextor WORTHY was a Source of Supply (SOS) of both heroin and
cocaine for Jerry CLARK. During numerous intercepted telephone
calls between Clarence WORTHY and other drug traffickers, WORTHY
displayed extensive knowledge of drug pricing, manufacturing,
and distribution. A number of these calls ultimately led
investigators to arrest Clarence WORTHY and Jerry CLARK on July
3, 2017, with one (1) kilogram of heroin in their possession.

2.     In January of 2017, investigators with the
Fayetteville Police Department interviewed a Confidential Source
(CS) who provided information about the drug trafficking
activities of Jerry Jerome CLARK and Clarence Dextor WORTHY aka
"DEE." The CS was a distributor and daily user of heroin. The CS
stated he/she met Jerry CLARK in the fall of 2015 and was
introduced by a mutual associate for the purpose of purchasing
heroin from CLARK. The CS stated he/she purchased heroin from
CLARK several times per week from November 2015 until he/she was
arrested in January of 2017.

3.     In January of 2016, the CS met with CLARK at WORTHY
BROTHERS TOWING in Spring Lake, North Carolina. The CS stated
he/she performed mechanical work on a number of vehicles CLARK
kept at the business. The CS also performed mechanical work for
Clarence WORTHY. The CS stated he/she would visit CLARK or
WORTHY at WORTHY BROTHERS TOWING at least once a week to perform
mechanical work. The CS stated CLARK paid him/her in heroin and
cash for mechanical work performed on vehicles. WORTHY would pay

3

the CS in cash, but CLARK also paid the CS in heroin for work performed on WORTHY's vehicles. While WORTHY never provided drugs to the CS directly, WORTHY was present multiple times when CLARK provided the CS heroin at the business. The CS estimated purchasing approximately two (2) ounces of heroin from CLARK per month from November 2015 until January 2017. This included heroin purchased from CLARK and heroin provided by CLARK for mechanical work performed by the CS for CLARK and WORTHY.

4. In October or November of 2016, CLARK approached the CS about converting a work van into a mobile car washing business. The CS stated he/she traveled with Clarence WORTHY and Jerry CLARK to a business in Fayetteville, NC, to purchase equipment for the car washing business. The CS stated WORTHY purchased approximately $8,000.00 worth of equipment using a credit or debit card. The CS stated he/she walked into the parking lot and observed Jerry CLARK provide Clarence WORTHY a large sum of U.S. Currency (USC) to settle the balance paid on the credit card. The CS stated he/she believed CLARK used the Mobile Car Wash as a means to launder his drug profits derived from the sale of heroin.

5. Following information received from the CS, the Fayetteville Police Department and the North Carolina State Bureau of Investigation (NCSBI) opened a joint investigation into Jerry CLARK. This investigation involved the interception of several telephones used by members of the DTO.

6. On May 5, 2017, NCSBI SA Bradley Williams appeared before a Judicial Review Panel consisting of NC Superior Court Judges L. R. Davis Jr., R. S. Albright, and E. Morgan. The Judicial Review Panel authorized the interception of wire communications over telephones with assigned numbers (910) 633-3820 (used by Bruce Eric CLARK) and (910) 689-6444 (used by Jerry Jerome CLARK), hereinafter referred to as TARGET TELEPHONE #2 and #3, respectively. The Orders were served on the cellular providers and interceptions began on May 5, 2017, for TARGET TELEPHONE #2 and May 10, 2017, for TARGET TELEPHONE #3. During the period of interception, several calls were intercepted

4

between Jerry CLARK and Clarence Dextor WORTHY indicating they were actively conspiring to distribute illegal drugs in the Fayetteville, North Carolina, area. For example:

7.    For example, on May 24, 2017, at approximately 8:45 pm, Jerry CLARK, using TARGET TELEPHONE #3, received an incoming call from Clarence WORTHY, using an unknown telephone number (Call/Session #4379). During the call, WORTHY told CLARK he wanted to "wait until tomorrow" to "put him on speaker… to let you hear it." CLARK replied, "I ain't got to hear it." WORTHY then placed an outgoing call from another telephone and placed the unknown male (UM) on speaker for CLARK to hear. The UM told WORTHY he could "do it" for "twenty two fifty… [22-50] and it would make the whole thing eighty one [81]." WORTHY asked CLARK, "Did you hear? CLARK answered negatively. WORTHY repeated, "Twenty two five [22-5]." CLARK asked, "You know what… that times two [2] go for… that… times two [2]?" WORTHY asked for clarification. CLARK asked, "You said he had a nine [9]?" WORTHY asked for clarification. CLARK asked again, "You said he had a nine [9]… times two [2]?" WORTHY replied, "Yeah.. nine [9] of them… times nine [9]." CLARK asked WORTHY what "that goes for," and added, "No more than thirty five hundred [3500]." WORTHY told CLARK, "The whole thing is eighty one [81]," and added, "It's got the stamp and all on it." CLARK laughed.

8.    On May 24, 2017, at approximately 9:10 pm, Jerry CLARK, using TARGET TELEPHONE #3, received an incoming call from Clarence WORTHY, using telephone number (910) 488-2080 (Call/Session #4388). During the call, CLARK told WORTHY, "Uh… you know, he know what to do, don't he?" WORTHY clarified, "What… to uh… put something with it?" CLARK replied, "Yeah… you can't make no money off that like that." WORTHY told CLARK, "He claim you can do something to it and it still be straight," and added, "That's his field so I'm… going to listen what he tell me." CLARK continued, "You tell him… if he get me at eight [8] and a half." WORTHY questioned, "Eight [8] and a half?" CLARK added, "Yeah." WORTHY acknowledged. CLARK repeated, "Uh, remember, eight [8] and a half," and indicated he would speak to WORTHY about it later.

5

9.   Based on my training, experience, and knowledge of the case, I believe twenty two five (22-5), eighty one (81), and thirty five hundred (3500), are all prices for specific quantities of heroin. I believe Clarence WORTHY was relaying a price for a kilogram of heroin ($81,000.00) and specifically discussed how that price breaks down to price per ounce ($2,250.00 x 36 = $81,000.00). I also believe CLARK thought the price was too high and named a specific price he deemed satisfactory for two (2) ounces of heroin: "No more than thirty five hundred [3500]." I know based on my training an experience that Central and South American Drug Trafficking Organizations stamp designs, shapes, words and other patterns into kilogram quantities of drugs when manufactured and packaged outside the United States. This practice is done to identify ownership of drug shipments and is often viewed by drug traffickers based in the United States as a signature of undiluted, higher quality drugs free of cutting agents. I believe WORTHY described this to CLARK: "It's got the stamp and all on it." I also believe CLARK indicated he would consider purchasing a smaller quantity of heroin for the price proposed by WORTHY: "Eight [8] and a half?"

10.   On June 3, 2017, at approximately 8:33 pm, Jerry CLARK, using TARGET TELEPHONE #3, placed an outgoing call to Clarence WORTHY, using telephone number (910) 488-2080 (Call/Session #7722). During the call, WORTHY told CLARK he had to "see Tim anyway tomorrow." CLARK questioned, "Another one?" WORTHY continued, "Yeah, I could have seen him tonight… that thing I told you about… that he had bought?" CLARK acknowledged. WORTHY continued, "He already done mastered it." CLARK questioned, "What he say?" WORTHY continued, "The other thing he bought… that um… stuff you said you tried it before." CLARK acknowledged. WORTHY added, "Tim going to put it to work… he ain't going to play with it… you know that the man take one [1] and make three [3] out of… he ain't change nothing… been doing it for years." CLARK acknowledged. WORTHY added, "They holler… they holler for a minute, but they come back," WORTHY continued, "hollering and steady buying." WORTHY told CLARK, "The other one…" people just shouldn't "get carried away with it… just don't get carried away." WORTHY said, "I told you he paid eleven

hundred dollars [$1,100.00] for it." CLARK acknowledged, "Right." WORTHY added, "To every one [1] he putting four [4] with it." CLARK exclaimed, "What?!" WORTHY repeated, "For every one [1] of them he putting four [4] with it… people uh, take it to the cook out… coming back like god dammit… that's what he says now… you know." CLARK acknowledged. WORTHY said, "Hell, he ain't lying…" like "smoke god damn glue." CLARK laughed. WORTHY said they walking around "high as motherfucking the world." CLARK said, "Walking around eyes glued together." WORTHY agreed, "Like a Chinese man."

11. Based the conversation above, I believe one (1), three (3), and four (4) are all references to a quantity of illegal drugs. I also believe WORTHY and CLARK discussed the dilution of illegal drugs with cutting agent. Specifically, I believe WORTHY discussed taking one (1) unit of an illegal drug and diluting the drug with four [4] units of a cutting agent: "To every one [1] he putting four [4] with it." Furthermore, I believe "take it to the cookout" is a specific reference to converting cocaine HCl into cocaine base (crack). I know from my training and experience drug traffickers refer to converting cocaine HCl into cocaine base (crack) as "cooking crack." I also know cutting agent added to cocaine HCl is burned away during the conversion process leaving only the cocaine base. This often results in the loss of overall gram weight and is referred to as "the comeback" by crack cocaine dealers.

12. On June 7, 2017, at approximately 9:00 am, Jerry CLARK, using TARGET TELEPHONE #3, placed an outgoing call to Clarence WORTHY, using telephone number (910) 797-9069 (Call/Session #8806). During the call, CLARK asked WORTHY when he would "call Big Time?" WORTHY asked, "Who?" CLARK repeated, "Big Time… today?" WORTHY answered negatively. CLARK told WORTHY, "Well, I need one [1]." WORTHY acknowledged. CLARK asked, "How much is it?" WORTHY told CLARK he would be "at the office in about two [2] minutes." CLARK asked for WORTHY to "just tell me how much… how much is it… for me to bring?" WORTHY asked for clarification. CLARK continued, "What you get from Big Time… what you give for something like that?" WORTHY answered, "Ok, ok… thirty five [35]." CLARK acknowledged. WORTHY told

CLARK he "got to see" and instructed CLARK not to do "nothing until I see." CLARK acknowledged.

13. Based on the conversation above, I believe one (1) is a reference to a quantity of illegal drugs. I also believe thirty five (35) is a reference to a price per unit for the drug. Furthermore, I believe WORTHY and CLARK discussed the purchase of one (1) kilogram of cocaine. I know from my training and experience thirty five thousand ($35,000.00) is within the wholesale price range for a kilogram of cocaine HCl. I believe WORTHY indicated he would inquire with his Source of Supply for the availability of the kilogram and instructed CLARK to wait for his return call before CLARK guaranteed delivery of the drugs to the customer.

14. On June 8, 2017, following the above call and others, at approximately 11:51 am, the Affiant observed a dark blue four-door Pontiac G-6 occupied by Jerry CLARK and a black male fitting the physical description of Clarence WORTHY arrive at 5048 Tangerine Drive, Fayetteville, NC. The Affiant observed Jerry CLARK walking to the front door of the residence wearing a black short sleeve tee-shirt.

15. CLARK departed in the Pontiac after approximately fifteen (15) minutes. At approximately 12:58 pm, DTO member Bruce CLARK departed the residence and was subsequently stopped by police. Bruce CLARK fled on foot and was eventually captured in a creek near the traffic stop. After a search, a small amount of marijuana was seized from Bruce CLARK.

16. Investigators then secured the residence located at 5048 Tangerine Drive, and detained another subject and two (2) juveniles. A subsequent search warrant produced approximately twenty six (26) grams of heroin from the residence. The enforcement action produced a series of intercepted telephone calls between DTO members discussing the enforcement action.

8

17. On June 8, 2017, at approximately 4:38 pm, Jerry CLARK, using TARGET TELEPHONE #3, placed an outgoing call to Kemmian MONROE (Bruce CLARK's girlfriend), using (910) 988-9856 (Call/Session #9612). During the call, CLARK asked MONROE, "Any word?" Monroe replied, "They said they found something in the house… a little something in the house, but… they ain't saying how much, but I know it couldn't have been too much because I got everything big with me." CLARK acknowledged.


18. On June 8, 2017, at approximately 6:14 pm, Jerry CLARK, using TARGET TELEPHONE #3, placed an outgoing call to Clarence WORTHY, using telephone number (910) 797-9069 (Call/Session #9662). During the call, CLARK asked WORTHY for his location. WORTHY replied, "Spring Lake." CLARK asked, "How long you going to be out there." WORTHY replied, "I'm fixing to leave right now, what's up?" CLARK asked, "Where you going?" WORTHY replied, "You know where I'm going." CLARK told WORTHY, "No, I need to holler at you." WORTHY asked, "What's up?" CLARK said, "Hell, I didn't want to say on the phone." WORTHY acknowledged, "Ok… give me a hint." CLARK said, "Earlier today... you remember what my nephew called me about?" WORTHY acknowledged. CLARK continued, "Right, he got hit." WORTHY questioned, "All together?" CLARK clarified, "No... no." WORTHY asked, "They came back?" CLARK answered, "Yeah, they were watching… they were looking at his house." WORTHY acknowledged. CLARK continued as if reading a document, "Uh… uh… observed, observed a blue car pull in." WORTHY questioned, "At his house?" CLARK answered in the affirmative and continued, "black male get out… uh, observed the blue car leave." WORTHY acknowledged, "Ok." CLARK continued, "The blue car was trailed." WORTHY acknowledged, "Ok." WORTHY asked, "Somebody came to his momma's house?" CLARK told WORTHY "Yeah, they… uh, uh… searched the momma's house." WORTHY replied, "Damn." CLARK told WORTHY that was why he wanted to "ride out there and meet" with WORTHY. WORTHY acknowledged and asked CLARK for his location. CLARK replied, "Leland." WORTHY told CLARK to "come on if you're coming." CLARK acknowledged.

19. Based on the calls described above, I believe MONROE removed a large quantity of drugs from the residence located at 5048 Tangerine Drive prior to the arrival of investigators: "… I got everything big with me." I believe CLARK alerted WORTHY to the search warrant and the arrest of DTO members: "… He got hit." Investigators have established through the investigation that Bruce CLARK is Jerry CLARK's nephew, and I believe CLARK was referencing Bruce CLARK's law enforcement encounter. The specific details described by CLARK to WORTHY were listed in the search warrant affidavit for the residence. I believe CLARK obtained a copy of the affidavit from a DTO member to ascertain details of law enforcement's investigation of his DTO. Furthermore, I believe CLARK alerted WORTHY to law enforcement surveillance of WORTHY's vehicle (A blue Pontiac G-6) used to deliver the drug shipment. This vehicle would later be used by WORTHY to transport illegal drugs on the day of his arrest, as described below.

20. On June 28, 2017, SBI SA B. Williams appeared before a Judicial Review Panel consisting of NC Superior Court Judges L. T. Burke, R.S. Gottlieb, and S.E. Bray. The Judicial Review Panel authorized the interception of wire communications over telephones with assigned number (910) 689-6444 (used by Jerry Jerome CLARK) and (910) 797-9069 (used by Clarence Dextor WORTHY) hereinafter referred to as TARGET TELEPHONE #3 and #4, respectively. The Orders were served on the cellular providers and interceptions began on June 29, 2017.

21. Intercepted calls of CLARK and WORTHY between June 30, 2017, and July 3, 2017, indicated WORTHY was attempting to purchase one (1) kilogram of heroin, on behalf of CLARK, from WORTHY's Source of Supply, subsequently identified as Theodore LEE.

22. For example, on June 30, 2017, at approximately 8:01 am, Clarence WORTHY, using TARGET TELEPHONE #4, placed an outgoing call to Theodore LEE, using telephone number (910) 286-4879 (Call/Session #365). During the call, WORTHY and LEE greeted each other. LEE told WORTHY he was "out here trying to

10

work a little bit." WORTHY told LEE, "Ok, uh... Monday." LEE
replied, "Which one? The other one?" WORTHY confirmed, "Yeah,
the other one." LEE told WORTHY, "Ok, you want the whole thing?"
WORTHY said "yeah the whole thing... eighty one [81]... eighty two
[82], what is it?" LEE responded, "Oh lord jesus... right now it's
supposed to be eighty two [82]... I'm trying to work this thing
out... I'll talk to you when I see you... I don't want to talk on
the phone... we going to work it out." WORTHY asked, "So, what's
the number?" LEE told WORTHY, "Um... um, this what you do, this
what you do." WORTHY replied, "I'm listening." LEE told WORTHY
to "go with the eighty one [81]... eighty one-five [81-5], with
the other five [5] you owe me... and then, fuck it... I'll just keep
it at eighty one [81], fuck it." WORTHY asked, "So, go what
now?" LEE clarified, "We going to do eight one [81]... we going go
ahead and just do the eight one [81], fuck it." WORTHY
acknowledged. LEE complained he wouldn't make "shit off this
shit," and added, "We going to keep it there." LEE said he would
need to "go ahead and get it." LEE told WORTHY he thought WORTHY
would have picked "it" up before and LEE would have had "three
[3] more" of WORTHY's "cars." WORTHY said, "I did too," but it
didn't go as planned. LEE asked WORTHY, "Don't you remember that
first thing we had... when we first did it... it's that right
there," and added, "That... that, that um, that butter. That right
there was an eight [8], this a ten [10]." WORTHY acknowledged.
LEE confirmed, "Monday morning... you want to do it?" WORTHY
answered, "Yeah, I'll call you." LEE said, "It's already around...
I'll be ready soon as you call me." LEE reiterated, "Monday
morning, I'll be ready then, alright." WORTHY acknowledged.


     23.  On June 30, 2017, the Honorable James Ammons, North
Carolina Superior Court Judge, issued an order authorizing the
use of a pen register for the telephone used by Theodore LEE. On
July 2, 2017, pursuant to data received pursuant to the pen
register, investigators identified 40 Wilson Run in Bunnlevel,
North Carolina, as a possible residence for LEE. Detective T.
Tew observed a black Mercedes Benz bearing NC registration EKA-
9555 (Registered owner: Theresa OXENDINE-HOLT of 2949 Ramsey
Street, Fayetteville, NC 28311) parked in the driveway.

24.  On July 1, 2017, at approximately 2:41 pm, Clarence WORTHY, using TARGET TELEPHONE #4, received an incoming call from Theodore LEE, using telephone number (910) 286-4879 (Call/Session #478). During the call, LEE told WORTHY he was "just double checking to make sure… for Monday." WORTHY replied, "Yeah." LEE said he had just "talked to my people and stuff and they were trying to move some stuff around and stuff… you know." WORTHY added, "Yeah, I talked to him… Monday." LEE added he just "wanted to make sure… you know." WORTHY told LEE he would call LEE "back in two [2] minutes… let me double check… call you right back."

25.  At approximately 2:41 pm, Clarence WORTHY, using TARGET TELEPHONE #4, placed an outgoing call to Jerry CLARK, using TARGET TELEPHONE #3 (Call/Session #480). During the call, WORTHY told CLARK, "That car will be ready Monday." CLARK asked, "How do you know?" WORTHY asked, "Didn't you say Monday?" CLARK complained, "That second car wasn't strong… like uh, you know… you can tell him… hell, it wasn't strong, you know… as the first car." WORTHY acknowledged. CLARK asked, "You talked to him… he called you?" WORTHY answered in the affirmative. CLARK complained WORTHY wouldn't tell the Source of Supply what CLARK relayed about the quality of the drugs. WORTHY replied, "You can get a chance to talk him… tell him anything you want to tell him." CLARK acknowledged.

26.  At approximately 2:51 pm, Clarence WORTHY, using TARGET TELEPHONE #4, placed an outgoing call to Theodore LEE, using telephone number (910) 286-4879 (Call/Session #481). During the call, WORTHY confirmed, "Hey, yeah… yeah, everything's Monday." LEE acknowledged. WORTHY told LEE, "He hoping the car is a little faster than what it was, you know." LEE acknowledged. WORTHY repeated, "He hoping it's a little better." LEE told WORTHY, "It is… it's… the first thing, uh… like I said, that was probably an eight [8] the last time, this a ten [10] right here." WORTHY acknowledged. LEE continued, "It done been test good… and everything." WORTHY told LEE, "That's what I told him… that's the way life is… everybody want the best." LEE indicated he "said something" to "the people" and added, "Even though that was the eight [8] or whatever… it was

12

still the best around, but it was just different." LEE told
WORTHY he got "more compliments on the other car… how it looked
and everything," so he "told them… yall just need to keep this
kind right here… same color as this car right here… that's what
it is this time, though." WORTHY asked, "Ok, it's the same
thing… same thing the first time?" LEE answered, "Yeah, that
first one… that cream… it's more like white, know what I'm
saying?" WORTHY acknowledged. LEE said, "The people told me… you
can make one [1] into one [1] and a half, definitely." LEE
continued, "Another dude told me… he do one [1] on one [1]."
WORTHY replied, "Oh, wow." LEE continued, "The dude up… in
Sanford area… he say he do one [1] on one [1]." WORTHY told LEE,
"We want to get it and get it gone." LEE said, "Exactly." WORTHY
continued, "You don't want to put too much on it… we want it to
stand up, stand up in the front, you know what I'm saying… go on
down the track." LEE agreed and said he spoke to "people… in the
Goldsboro area" and "they do theirs for like thirty two [32] a
piece… no problem… thirty two [32] straight up, you know."
WORTHY replied, "That's what he do, I think that what he do. He
do thirty two [32] straight up," and added, "I was trying to
give him some… uh… some inside… he want to take it… and put it
all back together." WORTHY continued, "I told him… as far as
like me… I like to leave it like it is… have like, have like two
[2] different cars… have a thirty two [32] car and I might have
the twenty two [22] car… right? That's just what I do." LEE
acknowledged, "Exactly." WORTHY added, "I don't like to play
with it, to me… that's called playing with it… I don't like
that, I never have." LEE acknowledged. WORTHY continued, "What I
do is just raise the number up and that's it." LEE acknowledged,
"And they going to come get it." LEE agreed, "It's going to be
the same thing, but it's going to be better because you ain't
playing with it." WORTHY said, "I never, never did it… I'm just
old fashioned and that's just the way I am." WORTHY told LEE,
"That's what I do," and added he was trying to talk to "him into
it… See, you see… You know, I've been doing this shit all my
life. I know… I know the way… just raising them up, trying to
play with it… something might go wrong… I don't like doing that
shit." LEE agreed, "You know what, they going come get it
because it's good and they need that shit." WORTHY continued,
"And another thing, I only have two [2] prices… two [2] prices.
Like I get it, thirty two [32]. You want the other way, it might

anywhere from two [2] to twenty two [22] and I do it as needed, as needed... as needed." LEE agreed. WORTHY said, "I can slow down and do it as needed, as needed... as needed," and added, "One car might run faster than the other, so I don't do it all at one time, as needed. Then this car out run the other one, I'm still alright and I'm ready to go back to the track again." LEE agreed. WORTHY said, "That's what I'm trying to put in his head." LEE agreed, "He'll get it." WORTHY added, "That's how I do mine." LEE told WORTHY he would "call these people back and let them know... what the deal is... let me just call them and let them know."

27. Based on the sequence of calls described above, my training, experience, and knowledge of the investigation, I believe "stuff," "car," "it," are all references to heroin. I believe "twenty two [22]," and "thirty two [32]," are references to price per ounce of heroin. I believe LEE and WORTHY discussed the process of diluting illegal drugs with cutting agents and distributing illegal drugs. I also believe WORTHY indicated he would be ready to purchase one (1) kilogram of heroin and provided the day of the week he would be ready: "Hey, yeah... yeah, everything's Monday." Furthermore, I believe WORTHY described to LEE his extensive knowledge of illegal drug manufacture and distribution. I believe WORTHY also indicated his dislike for diluting illegal drugs with cutting agent because of the potential difficulty selling the diluted drugs. Moreover, I believe WORTHY provided a time frame for which he has been involved in the illegal drug trade and indicated he actively mentored other drug traffickers: "... I've been doing this shit all my life. I know... I know the way... just raising them up, trying to play with it... something might go wrong... I don't like doing that shit."

28. On Monday, July 3, 2017, at approximately 7:00 am, NC SBI SA B. Williams and Fayetteville Police Department (FPD) Detective T. Tew established surveillance at 40 Wilson Run Road, Bunnlevel, NC. The Mercedes Benz previously observed at the residence was parked in the driveway. Detective TEW also observed a yellow Chevrolet Camaro bearing NC registration EJS-

4964 (Registered owner: PV HOLDING CORP of Raleigh Durham Airport, Raleigh, NC 27623) parked near the residence.

29. At approximately 7:00 am, FPD Detectives T. Patton and K. Stein established surveillance in the area of 1608 Boros Drive, Fayetteville, North Carolina. At approximately 8:00 am, Detective Stein observed Clarence WORTHY depart the residence in a blue Pontiac G-6 bearing NC registration EJX-7762 (Registered owner: Emekia Tylee CORBIN of 214 Hickory Street, Spring Lake, NC 28390). Detectives K. Stein and T. Patton maintained surveillance on the vehicle until it arrived at 604 Mont Drive in Spring Lake, NC (WORTHY BROTHERS TOWING).

30. At approximately 8:01 am, Jerry CLARK, using TARGET TELEPHONE #3, placed an outgoing call to Clarence WORTHY, using TARGET TELEPHONE #4 (Call/Session #733). During the call, CLARK asked WORTHY, "What time you pulling out?" WORTHY replied, "Now… right now" CLARK acknowledged. CLARK asked WORTHY, "When you leave… let me know." WORTHY acknowledged.

31. At approximately 8:43 am, Clarence WORTHY, using TARGET TELEPHONE #4, received an incoming call from Theodore LEE, using telephone number (910) 286-4879 (Call/Session #750). During the call, WORTHY asked LEE, "What time you talking about?" LEE told WORTHY "whatever time you want to do it." WORTHY acknowledged and told LEE, "Let me call you in about fifteen [15] minutes." LEE acknowledged.

32. At approximately 9:32 am, Clarence WORTHY, using TARGET TELEPHONE #4, placed an outgoing call to Theodore LEE, using telephone number (910) 286-4879 (Call/Session #754). During the call, WORTHY told LEE he could "pick that car up in Deerfield." LEE questioned, "Hello?" WORTHY repeated, "Yeah… I said I can pick that car up in Deerfield." LEE questioned, "In Deerfield?" WORTHY added, "Yeah, like we rolled through before." LEE acknowledged and asked, "Ok… when you want to do it." WORHTY replied, "I'm ready now." LEE asked WORTHY if he could "give me" until "like ten o'clock to get over there?" WORHTY acknowledged.

LEE and WORTHY agreed they would contact each other when they "get close."

33. At approximately 9:40 am, NC SBI SA C. Massey and SBI SA J. Stout observed a yellow Chevrolet Camaro depart the residence located at 40 Wilson Run, Bunnlevel, NC. SA Massy and SA Stout maintained surveillance on the vehicle until it arrived at the Kangaroo gas station located at 2075 North Bragg Blvd, Spring Lake, NC. The driver, subsequently identified as Theodore Jacques LEE, was observed by SA Stout entering the business. After approximately five (5) minutes, the Affiant observed LEE exit the business wearing a blue short-sleeved shirt and khaki shorts. The Affiant observed LEE get back into his vehicle. The Affiant observed LEE depart the gas station and proceed to the Kangaroo gas station located at 1886 N. Bragg Blvd, Spring Lake, NC, where he remained in his vehicle.

34. At approximately 10:04 am, Clarence WORTHY, using TARGET TELEPHONE #4, received an incoming call from Theodore LEE, using telephone number (910) 286-4879 (Call/Session #757). During the call, LEE questioned, "You see me?" WORTHY questioned, "No… what you ready?" LEE said, "Yeah… yeah I'm here already." WORTHY replied, "I thought you said you'd call me… when you… got there." LEE told WORTHY he would "get me some coffee right quick… I'll see you… I'm going to… get me some coffee." WORTHY acknowledged.

35. At approximately 10:14 am, Clarence WORTHY, using TARGET TELEPHONE #4, placed an outgoing call to Theodore LEE, using telephone number (910) 286-4879 (Call/Session #759). During the call, WORTHY told LEE, "I'm here, where you at?" LEE replied, "Alright, here I come… I just rolled down the street real quick… I didn't want to just sit there at the store, here I come right now." WORTHY acknowledged.

36. At approximately 10:15 am, LEE departed the gas station at 1186 N. Bragg Blvd in Spring Lake and proceeded northbound. LEE turned right onto Deerfield Road, where the Affiant observed LEE briefly meet car to car with the dark blue

16

Pontiac G-6 in the middle of the road. This was the same vehicle observed earlier by Detective K. Stein driven by WORTHY from his residence at 1608 Boros Drive, Fayetteville, NC. The Affiant was unable to maintain surveillance on the meeting. However, at approximately 10:16 am, SA C. Massey observed an exchange between the vehicles while they were inside the Deerfield subdivision. SBI SA C. Massey and J. Stout maintained surveillance on LEE in his yellow Chevrolet Camaro as he departed and proceeded northbound on NC Hwy 87. FPD Detective T. Tew, T. Patton, and J. Yowell maintained surveillance on WORTHY in his blue Pontiac G-6 as he proceeded southbound on NC Hwy 87. Detective T. Tew observed WORTHY make a left turn onto E. Manchester Road from NC Hwy 87.

37. At approximately 10:18 am, North Carolina State Highway Patrol (NC SHP) Trooper M. Cape initiated a traffic stop on the blue Pontiac G-6 operated by Clarence WORTHY on Manchester Road near NC Hwy 87. After initially stopping his vehicle on the shoulder of the road, WORTHY sped away from the traffic stop. Troopers M. Cape, J. Lamm and TFO R. Reaves pursued the vehicle. WORTHY turned northbound onto NC Hwy 210 from Manchester Road. Shortly after his turn onto NC Hwy 210, WORTHY entered TFO R. Reaves's lane of travel and struck TFO Reaves's vehicle. TFO Reaves then forced WORTHY to the shoulder of NC Hwy 210 where WORTHY's vehicle came to a stop. WORTHY exited the passenger side of the vehicle and threw a blue canvass bag under his vehicle, as observed by TFO Reaves. TFO Reaves, Trooper J. Lamm, and Trooper M. Cape placed WORTHY and his front seat passenger, Jerry Jerome CLARK, into custody without further incident. Detective T. Tew recovered the blue canvass bag and discovered one (1) compressed block of brown powder wrapped in silver duct tape. The substance weighed approximately 1,386 grams and field tested positive for the presence of heroin.

38. At approximately 10:25 am, SA J. Stout and C. Massey observed LEE stop at Tobacco Plus located at 3274 Ray Road, Spring Lake, NC, where SA Massey observed LEE entering the business. After approximately five (5) minutes, LEE returned to his vehicle and departed, as observed by SA Massey. When LEE

departed the Tobacco Plus, he proceeded back to the area of Wilson Run in Bunnlevel. At approximately 10:50 am, SA C. Massey observed LEE park his vehicle beside the road on Remington Hill Drive and walk toward 40 Wilson Run, Bunnlevel, NC, with a back pack slung over one shoulder. SA Massey observed LEE enter the front door of 40 Wilson Run, Bunnlevel, NC. The Affiant also observed LEE walking along Remington Hill Road with the back pack and wearing a blue shirt and khaki shorts.

39. At approximately 11:43 am, SA C. Massey observed LEE walk out of the residence at 40 Wilson Run and get into the yellow Camaro. LEE drove out of the neighborhood and was subsequently stopped and placed into custody. LEE and the vehicle were transported back to the residence.

40. At approximately 12:24 pm, investigators served the search warrant at 40 Wilson Run, Bunnlevel, NC, and detained Theresa OXENDINE-HOLT. A juvenile was also encountered in the residence. The Affiant observed stacks of United States Currency and a money counter on the kitchen table upon entering the residence. The Affiant also observed a .45 caliber Paraordiance semi-automatic pistol on the counter top to the left of the garage entry door. The Affiant observed additional USC laying in the kitchen floor. FPD D. Hardin also located a quantity of USC in a linen closet in the hallway of the residence. Sgt. Berg and the Affiant transported the USC to Branch Banking and Trust located at 300 Rowan Street, Fayetteville, NC, where an official count was conducted and totaled **$138,698.00**. This USC was administratively seized by the DEA Wilmington, NC, Resident Office. The Affiant believes most of this USC was delivered to LEE by Clarence WORTHY in exchange for the kilogram of heroin. As described above, the Affiant believes WORTHY paid LEE $81,000.00 for the kilogram of heroin. When questioned regarding the amount of USC seized from his home, LEE was unable to provide a specific total. LEE confirmed the price per kilogram of $81,000.00 for heroin he provided WORTHY during intercepted communications. However, LEE was unsure how much USC was inside his residence.

41. On July 11, 2017, the Affiant interviewed Theodore LEE regarding his interactions with Clarence WORTHY and Jerry CLARK. LEE stated he supplied Clarence WORTHY and Jerry CLARK with drugs on three (3) occasions. LEE stated he was introduced to WORTHY by an unidentified female for the purposes of supplying WORTHY with kilogram quantities of cocaine HCl and heroin.

42. LEE stated the first drug transaction he conducted with WORTHY was for one (1) kilogram of cocaine HCl for $34,000.00. This transaction occurred approximately two (2) months prior to LEE's arrest on July 3, 2017. LEE stated he delivered the kilogram of cocaine to Clarence WORTHY at WORTHY BROTHERS TOWING located at 604 Mont Drive, Spring Lake, North Carolina. LEE stated WORTHY, Jerry CLARK and a third unidentified black male were present when he delivered the cocaine. LEE stated WORTHY removed the packaging and LEE observed a heart-shaped stamp in the kilogram of cocaine. WORTHY paid LEE $34,000.00 cash for the cocaine. LEE's statements are consistent with the conversations intercepted from the wire such as the call between WORTHY and CLARK arranging for the purchase of one (1) kilogram of cocaine for approximately $35,000.00 referenced in paragraph 12 above.

43. LEE stated WORTHY contacted him later that day and requested half a kilogram of heroin. LEE stated he delivered the half kilogram of heroin to WORTHY in the Deerfield neighborhood the following day. LEE stated the transaction occurred the same way as the heroin delivery observed by investigators on July 3, 2017. LEE stated WORTHY drove the same blue Pontiac G-6 to conduct the transaction. LEE and WORTHY met window to window on the street where they conducted the drug transaction. LEE stated he then followed WORTHY back to WORTHY BROTHERS TOWING where LEE observed Clarence WORTHY and Jerry CLARK dilute the heroin with a cutting agent he described as "Equate fiber powder." LEE stated WORTHY paid him $39,000.00 cash for the half kilogram of heroin. LEE stated WORTHY gave LEE the cash in a blue insulated bag and indicated he wanted the bag back. On July 3, 2017, the same bag was used by LEE to conceal the kilogram of heroin and it was seized by law enforcement.

44. LEE stated WORTHY told him WORTHY BROTHERS TOWING was Clarence WORTHY's company and WORTHY worked with different law enforcement agencies as a tow truck driver. WORTHY told LEE not to be alarmed if he observed marked law enforcement vehicles at the business. LEE stated WORTHY referred to kilogram quantities of cocaine HCl and heroin as "cars" while discussing drug transactions over the telephone. LEE's statement is consistent with conversations intercepted from the wire as set forth in paragraphs 22, 25 and 26 above. WORTHY told LEE he wanted to begin purchasing drug shipments from LEE regularly. WORTHY indicated he wanted to purchase two (2) kilograms of cocaine HCl and two (2) kilograms of heroin per month. LEE stated the price per kilogram discussed with WORTHY was $34,000.00 for cocaine and $81,000.00 for heroin. The tentative arrangement for the on-going drug purchases equaled $230,000.00 per month.

## ADDITIONAL FACTS IN SUPPORT OF PROBABLE CAUSE

45. Investigators also executed a search warrant at Clarence Dextor WORTHY's home located at 1608 Boros Drive, Fayetteville, North Carolina. A search of WORTHY's home produced a 2016 Chevrolet Corvette Stingray, which was seized by the Fayetteville Police Department. Documents recovered from the vehicle indicated Clarence WORTHY purchased the vehicle on May 11, 2016, and put $30,700.00 down on the vehicle. A receipt indicated WORTHY put $25,000.00 of this amount on a debit card in the name of WORTHY BROTHER'S TOWING (Card#: 4635 7300 0078 5839). The vehicle was registered to Clarence WORTHY and WORTHY BROTHER'S TOWING, INC. In order to title the vehicle in the name of the towing company, Clarence WORTHY provided a copy of the Articles of Incorporation for WORTHY BROTHERS TOWING, INC., a North Carolina corporation that was formed in February 2009. However, your Affiant is aware that WORTHY BROTHERS TOWING, INC., was administratively dissolved in January 2015 for failure to file annual reports with the Secretary of State.

46. The odometer at the time of purchase indicated the vehicle had forty four (44) miles. The current mileage for the

vehicle is six hundred and thirty seven (637) miles. The type of
vehicle purchased (e.g., luxury sports car), the limited number
of miles driven over the year in which WORTHY owned it, and that
fact that the vehicle was recovered from the garage at WORTHY's
residence, all lead the Affiant to believe that this vehicle was
never used or intended to be used for business-related purposes.
Rather, the Affiant has reason to believe that this vehicle was
a luxury item purchased by WORTHY for personal pleasure using
proceeds of drug trafficking, as set forth in greater detail
below.   Furthermore, the Affiant believes that WORTHY registered
the vehicle in the name of the towing business and used a
business debit card to pay the $25,000 down payment in order to
conceal the illegitimate source of the funds used to purchase
it.

47.   In September 2017, pursuant to the investigation of
the Chevrolet Corvette purchase, the Affiant obtained a state
search warrant for records from Bank of America for WORTHY
BROTHERS TOWING accounts. These records included a WORTHY
BROTHER'S TOWING checking account (#0006 8904 5046), a credit
card account (#4339 9300 1663 6120), and the Chevrolet Corvette
automobile loan account. The signature pages for the checking
account listed an account title of Clarence D. Worthy DBA WORTHY
BROTHERS TOWING. The signature page for the account listed
Clarence D. Worthy as the owner. The account also listed Curtis
Worthy and Winifred A. Worthy as business signers. The records
reflected activity inconsistent with that of a towing company
business account.

48.   As described above, on May 11, 2016, Clarence WORTHY
used his WORTHY BROTHERS TOWING Bank of America debit card to
place a $25,000.00 down payment on a 2016 Chevrolet Corvette
Stingray. The balance of the purchase price was financed with a
$52,805.50 Bank of America auto loan, also in the name of WORTHY
BROTHERS TOWING, with monthly payments in the amount of $825.91.
According to a Bank of America representative, all but one (1)
of the loan payments have been made in cash at a Bank of America
teller window. The records indicate WORTHY has made these cash
payments frequently in amounts as much as $2,000.00 cash each
month. The most recent payment in July 2017, shortly after

21

WORTHY's arrest and the impoundment of the vehicle, was reduced to the amount of $900.00 and debited directly from the WORTHY BROTHERS TOWING business checking account rather than paid in cash. The balance of the auto loan as of July 21, 2017, was reported as $29,841.45.

49. On November 10, 2016, Clarence WORTHY deposited $12,000.00 in cashier's checks. One (1) check was a PNC Bank check in the amount of $7,000.00. The second check was a Bank of America check in the amount of $5,000.00. Both checks were purchased on November 7, 2017, by WORTHY's brother and business partner, Curtis WORTHY. The memo on both checks indicated the funds were for repayment of a loan. This activity is also within the time frame described by the CS in which Jerry CLARK provided WORTHY a large sum of USC. The total deposits for November 2016 equaled $19,538.00, which is substantially higher than the amount of total deposits typically made in other months. Three thousand dollars (**$3,000.00**) of the total deposits was made in cash and twelve thousand dollars (**$12,000.00**) were the aforementioned cashier's checks.

50. On February 10, 2017, the WORTHY BROTHERS TOWING business credit card account reflected a credit purchase from Reed's Jewelers in the amount of $11,000.00. WORTHY then made a $10,181.00 payment to the credit card the following month from the business checking account, after he deposited $9,495.00 in cash into the business checking account during February 2017. This amount of cash deposits was substantially higher than the amount cash deposits typically made in other months.

51. On March 7, 2017, the WORTHY BROTHERS TOWING credit card account reflected a credit purchase from Gold and Diamonds in the amount of $7,700.00. WORTHY again paid the credit balance in full the following month from the business checking account.

52. The Affiant examined the account activity for the life of the account since it was established on November 19, 2004. Bank of America could not provide specific check and cash deposit amounts before 2010. However, the total deposits for

each year were provided. A summary of total deposits, cash
deposits (for years 2010 onward), and year-end balance is
provided in table form below:

| YEAR | DEPOSITS | CASH | OTHER | DEBITS | END BALANCE | GAIN/LOSS |
|---|---|---|---|---|---|---|
| 2004* | $ 2,595.00 | N/A | N/A | $ (254.04) | $ 2,340.96 | $ 2,340.96 |
| 2005 | $ 38,445.20 | N/A | N/A | $(12,057.66) | $ 28,728.50 | $ 26,387.54 |
| 2006 | $ 48,109.74 | N/A | N/A | $(29,383.80) | $ 47,454.44 | $ 18,725.94 |
| 2007 | $ 45,763.72 | N/A | N/A | $(34,386.31) | $ 58,831.85 | $ 11,377.41 |
| 2008 | $ 52,662.26 | N/A | N/A | $(54,864.21) | $ 56,629.90 | $ (2,201.95) |
| 2009 | $ 97,705.49 | N/A | N/A | $(74,484.21) | $ 79,851.18 | $ 23,221.28 |
| 2010 | $ 75,727.97 | $ 48,729.03 | $ 26,998.94 | $(66,686.03) | $ 88,893.12 | $ 9,041.94 |
| 2011 | $ 55,799.30 | $ 7,875.00 | $ 47,924.30 | $(69,524.46) | $ 75,167.96 | $(13,725.16) |
| 2012 | $ 47,889.92 | $ 8,363.53 | $ 39,526.39 | $(44,107.75) | $ 78,950.13 | $ 3,782.17 |
| 2013 | $ 65,321.45 | $ 5,506.00 | $ 59,815.45 | $(52,281.19) | $ 91,990.39 | $ 13,040.26 |
| 2014 | $ 67,887.52 | $ 11,488.00 | $ 56,399.52 | $(48,719.42) | $ 111,158.49 | $ 19,168.10 |
| 2015 | $ 79,535.70 | $ 31,909.21 | $ 47,626.49 | $(75,788.99) | $ 114,905.20 | $ 3,746.71 |
| 2016 | $121,508.44 | $ 47,167.03 | $ 74,341.41 | $(91,640.60) | $ 144,773.04 | $ 29,867.84 |
| 2017* | $ 60,420.11 | $ 24,347.70 | $ 36,072.41 | $(54,753.19) | $ 150,439.96 | $ 5,666.92 |
| * Denotes Partial Year | | | | | | $ 11,869.34 |

53. The $11,869.34 indicates the average annual gain
(deposits less debits) for the business account between full
years 2005 and 2016. The total cash deposits for the reported
period, January 2010 through July 2017, total **$183,885.50**. The
cash total includes a number of deposited cashier's checks and
money orders in the amount of $1,000.00 or over. Based upon the
statements of cooperating witnesses, the quantities of drugs
WORTHY was trafficking, the level of knowledge and
sophistication in the drug trade exhibited by WORTHY during
intercepted communications, the Affiant believes the balance of
the account is likely the result of the comingling of drug
proceeds with WORTHY BROTHERS TOWING business funds.  WORTHY had
access to large sums of USC to conduct drug transactions.
WORTHY's drug purchases from LEE exceeded $150,000.00 USC in
approximately two (2) months and he indicated he was prepared to
purchase $230,000.00 worth of drugs per month from LEE (as
described in paragraph 44). According to LEE, WORTHY paid for
drugs at the time of purchase and never received cocaine or
heroin on consignment. Additionally, the pattern of cash

23

deposits into the business account regularly exceeded the expenses for the business over many years. WORTHY stated during intercepted conversations that he had been trafficking drugs "all my life" (described in paragraph 26) which is consistent with his criminal history (set forth below in paragraph 59). Furthermore, WORTHY used the WORTHY BROTHERS TOWING business property and office to conduct drug transactions on multiple occasions (as described in paragraphs 3 and 42). This provided WORTHY with opportunity to comingle drug proceeds with any legitimate cash income that may have been generated by the business when making periodic bank deposits so as to conceal the true source of the illicit money. Finally, WORTHY made a number of purchases of personal luxury items from the business account. These purchases also coincided with larger than usual cash deposits observed from the bank records as described in greater detail below in paragraphs 54 and 55.

54. Monthly deposits from April 2016 through the present, both cash and check, are provided in the table below:

| MONTH | DEPOSITS | CASH | OTHER | DEBITS | END BALANCE | GAIN/LOSS |
|---|---|---|---|---|---|---|
| Apr-16 | $ 11,050.09 | $ 5,500.00 | $ 5,550.09 | $ (3,308.44) | $ 137,243.84 | $ 7,741.65 |
| May-16 | $ 11,105.00 | $ 6,000.00 | $ 5,105.00 | $(28,775.79) | $ 119,573.05 | $ (17,670.79) |
| Jun-16 | $ 6,171.00 | $ 3,500.00 | $ 2,671.00 | $ (3,535.87) | $ 122,208.18 | $ 2,635.13 |
| Jul-16 | $ 6,086.30 | $ 3,000.00 | $ 3,086.30 | $ (4,319.89) | $ 123,974.59 | $ 1,766.41 |
| Aug-16 | $ 8,695.00 | $ 3,525.00 | $ 5,170.00 | $ (6,499.84) | $ 126,169.75 | $ 2,195.16 |
| Sep-16 | $ 10,440.00 | $ 5,000.00 | $ 5,440.00 | $ (4,880.02) | $ 131,729.73 | $ 5,559.98 |
| Oct-16 | $ 11,538.24 | $ 3,739.24 | $ 7,799.00 | $ (4,293.42) | $ 138,974.55 | $ 7,244.82 |
| Nov-16 | $ 19,668.00 | $ 15,000.00 | $ 4,668.00 | $ (6,869.64) | $ 151,772.91 | $ 12,798.36 |
| Dec-16 | $ 10,717.52 | $ 4,501.00 | $ 6,216.52 | $(17,717.39) | $ 144,773.04 | $ (6,999.87) |
| Jan-17 | $ 4,987.00 | $ - | $ 4,987.00 | $ (3,988.75) | $ 145,771.29 | $ 998.25 |
| Feb-17 | $ 17,209.37 | $ 9,495.80 | $ 7,713.57 | $ (4,483.73) | $ 158,496.93 | $ 12,725.64 |
| Mar-17 | $ 11,195.06 | $ 2,771.94 | $ 8,423.12 | $(14,442.28) | $ 155,249.71 | $ (3,247.22) |
| Apr-17 | $ 4,209.96 | $ 3,079.96 | $ 1,130.00 | $(15,751.42) | $ 143,708.25 | $ (11,541.46) |
| May-17 | $ 9,493.00 | $ 4,500.00 | $ 4,993.00 | $ (5,388.50) | $ 147,812.75 | $ 4,104.50 |
| Jun-17 | $ 2,946.00 | $ 1,000.00 | $ 1,946.00 | $ (2,492.51) | $ 148,266.24 | $ 453.49 |
| Jul-17 | $ 5,414.12 | $ 2,000.00 | $ 3,414.12 | $ (4,560.66) | $ 149,119.70 | $ 853.46 |
| Aug-17 | $ 4,965.60 | $ 1,500.00 | $ 3,465.60 | $ (3,645.34) | $ 150,439.96 | $ 1,320.26 |

55. In April and May 2016, the month prior to and the month in which the 2016 Chevrolet Corvette was purchased, the cash deposits are notably higher. Also, in November 2016, the time frame of the alleged equipment purchase with coconspirator Jerry CLARK, cash deposits increase through the above described cashier's checks from Curtis WORTHY. Furthermore, in February 2017, the month of the first jewelry purchase, cash deposits are notably higher. Finally, in June, July and August 2017, following enforcement activity on DTO members and WORTHY's arrest on July 3, 2017, the amount of cash deposits has been lower than typical. Based on my knowledge of the investigation, my review of these financial statements and my training and experience, your Affiant believes that WORTHY purchased personal luxury items, such as the 2016 Corvette and gold and jewelry, using business accounts in the name of WORTHY BROTHERS TOWING, while depositing cash proceeds from drug trafficking into the business checking account, in order to conceal or disguise the nature, source or ownership of the drug proceeds.

56. The account was seized by the Fayetteville Police Department on August 31, 2017, pursuant to a state search warrant. The balance of the account as of that date is **$150,439.96.**

57. On July 6, 2017, the Affiant obtained records from the North Carolina Employment Security Commission for Clarence WORTHY. Those records indicated Clarence WORTHY reported no income between January 1, 2015, and July 7, 2017. Additionally, a review of checks written on the WORTHY BROTHERS TOWING business checking account reveals no indication of any salary or distributions made to Clarence WORTHY from the business from January 2010 to the present. Finally, a review of the WORTHY BROTHERS TOWING business checking account suggests that the towing business was only barely profitable, with deposits exceeding debits by an average of less than $12,000 per year from 2005 to 2016. Therefore, your Affiant is not aware of any legal source of income for Clarence WORTHY that would account for the level of wealth displayed by the purchase of the 2016 Chevrolet Corvette Stingray and $18,700 in jewelry.

58. The Affiant also obtained records from the North Carolina Employment Security Commission for Jerry CLARK. Those records indicated that Jerry CLARK reported no income between January 1, 2015, through August 30, 2017. As previously stated, WORTHY is CLARK's source of supply, as indicated through telephonic intercepts, and WORTHY was present when CLARK paid the CS in heroin for mechanical work performed at the tow company. Therefore, you Affiant believes that WORTHY knew he was laundering CLARK's drug proceeds when he purchased equipment for CLARK to start a mobile car wash business in November 2016 and received a large sum of cash from CLARK in return.

59. A criminal records check revealed that Clarence WORTHY has prior felony convictions for Sell and Deliver Marijuana (1980), Possession of a Firearm by a Felon (1984), Second Degree Murder (1989), and Sell Cocaine (1990). Jerry CLARK has prior felony convictions for Possession with Intent to Sell and Deliver Cocaine (1991), Possession with Intent to Sell and Deliver Marijuana (1991), Maintaining a Dwelling for Keeping Controlled Substances (1991), Conspiracy to Traffic Cocaine (1995), and Trafficking Cocaine (1995).

## CONCLUSION

As a result of the foregoing, your Affiant requests a seizure
warrant for the following property:

One **2016 Chevrolet Corvette Stingray (VIN:1G1YF3D72G5114341)**,
upon probable cause to believe it is subject to forfeiture
pursuant to Title 21, United States Code, Section 881(a)(6) as
property traceable to proceeds of a drug trafficking offense
and/or 18 U.S.C. § 981(a)(1)(A) as property involved in a money
laundering transaction; and

**$150,439.96 in U.S. Currency**, upon probable cause to believe it
is subject to forfeiture pursuant to Title 18, United States
Code, Section 981(a)(1)(A) as property involved in money
laundering.


JAMES D. YOWELL
Task Force Officer
Drug Enforcement Administration


On this **16** day of **Oct.** 20**17**, JAMES D. Yowell
appeared before me via reliable electronic means, was placed
under oath, and attested to the contents of this Affidavit.


JAMES E. GATES
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NORTH CAROLINA